HOWARTH & SMITH
ATTORNEYS AT LAW
523 WEST SIXTH STREET
SUITE 728
LOS ANGELES, CALIFORNIA 90014
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

December 5, 2013

SUZELLE M. SMITH

SSmith@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 111

**VIA U.S. MAIL**

Ms. Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeal for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re: *Calderon-Cardona v. Bank of New York Mellon, et al.*; Case No. 12-75

Dear Ms. Wolfe:

We are counsel for the Levin Plaintiffs and Judgment Creditors in the action entitled *Jeremy Levin, et al. v. Bank of New York Mellon, et al.,* Case No. 09 CV 5900, pending in the U.S. District Court for the Southern District of New York. We filed an amici brief in *Calderon-Cardona v. Bank of New York Mellon, et al.* on February 1, 2013.

At a recent hearing before the Honorable Robert P. Patterson in the *Levin* matter (which is another FSIA/Blocked Assets case), the Court asked the Levin parties to be sure that the Second Circuit panel in the *Calderon* action had a copy of the Order and Opinion, dated September 19, 2013, in which Judge Patterson addressed issues which are relevant to *Calderon*. Complying with that request, we attach the Order and Opinion for circulation to the Panel.

Very truly yours,

Suzelle M Smith

SMS:cf
Enclosure
cc:    All Counsel of Record (via email)
       Don Howarth, Esq.
       Jessica R. Rankin, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MR. JEREMY LEVIN and DR. LUCILLE LEVIN,

                    Plaintiffs,

          - against -

THE BANK OF NEW YORK MELLON, JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK, N.A.,
SOCIÉTÉ GÉNÉRALE, and CITIBANK, N.A.,

                    Defendants.
-------------------------------------------------------------------X
THE BANK OF NEW YORK MELLON, JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK, N.A.,
SOCIÉTÉ GÉNÉRALE, and CITIBANK, N.A.,

                    Third-Party Plaintiffs,

          - against -

STEVEN M. GREENBAUM, et al.,

                    Third-Party Defendants.
-------------------------------------------------------------------X
THE BANK OF NEW YORK MELLON, JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK, N.A.,
SOCIÉTÉ GÉNÉRALE, and CITIBANK, N.A.,

                    Third-Party Plaintiffs,

          - against -

ESTATE OF MICHAEL HEISER, et al.,

                    Third-Party Defendants.
-------------------------------------------------------------------X
THE BANK OF NEW YORK MELLON, JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK, N.A.,
SOCIÉTÉ GÉNÉRALE, and CITIBANK, N.A.,

                    Third-Party Plaintiffs,

09 CV 5900 (RPP)

**OPINION & ORDER**

- against -

CARLOS ACCOSTA, et al.,

                          Third-Party Defendants.
--------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On August 29, 2012, Plaintiffs Jeremy Levin and Dr. Lucille Levin (the "Levin

Plaintiffs" or the "Levins") and third-party Defendants Steven M. Greenbaum, et al. (the

"Greenbaum Judgment Creditors"), Carlos Accosta, et al. (the "Accosta Judgment Creditors"),

and the Estate of Michael Heiser, et al. (the "Heiser Judgment Creditors") (collectively the

"Judgment Creditors") filed a joint motion for partial summary judgment on their claims for

turnover of certain blocked assets among those that this Court has designated as the Phase Two

Blocked Assets.[1]  (Judgment Creditors' Joint Mot. for Partial Summ. J. ("Phase Two Motion"),

ECF No. 763.)  These assets are currently held by the Defendants Bank of New York Mellon

("BNYM"); JPMorgan Chase & Co., JPMorgan Chase Bank (collectively, "JPMorgan"); Société

General ("SoGen"); and Citibank (collectively, the "Banks").[2]  (Id. at 11.)  JPMorgan and

SoGen[3] filed their opposition papers on October 15, 2012 ("JPMorgan Opp." and "SoGen Opp.,"

---

[1] In the present motion, the Judgment Creditors seek turnover of approximately $4.7 million or 82% of the Phase Two Blocked Assets. (See Tr. of Aug. 16, 2012 Hr'g ("8/16/12 Tr.") at 7, ECF No. 777.)  According to the Judgment Creditors, the remaining Phase Two Blocked Assets are not ripe for summary judgment at this time.  (Id. at 3; see also Letter from Richard M. Kremen ("8/16/12 Judgment Creditors' Let.") at 2.)

[2] The Court assumes familiarity with the factual background and prior history of this case.  A more complete description of the case may be found in the Court's decision regarding the Phase One Blocked Assets.  See Levin v. Bank of New York, No. 09 CV 5900, 2011 WL 812032, at *1 (S.D.N.Y. Mar. 4, 2011) ("Levin I").

[3] Unlike the other Banks, SoGen does not oppose turnover of the Phase Two Blocked Assets.  (See SoGen Opp. at 1.)  Instead, SoGen's opposition papers only raise the issue of whether the Judgment Creditors are entitled to interest on the assets for the time spanning the date of blocking to the date of turnover.  (See id.)  Citibank joined SoGen's opposition on this point, which was not raised by the other Banks; Citibank also opposes turnover of the electronic fund transfers ("EFTs").  (See Citibank Opp. at 2.)

respectively); BNYM filed its opposition papers on October 16, 2012 ("BYNM Opp."); and

Citibank filed its opposition papers on October 22, 2012 ("Citibank Opp.").[4]

     The Banks identified over two hundred commercial third-party Defendants – persons or

entities with potential rights or claims to the Phase Two Blocked Assets.[5]  The Judgment

Creditors served each of these potential third-party Defendants; however, only six answered the

third-party complaints and claimed any interest in any of the Phase Two Blocked Assets. (See

Decl. of Curtis C. Mechling in Supp. of J. Creditors' Joint Mot. for Partial Summ. J. on Claims

---

[4] Citibank's opposition memorandum of law does not contain any case citations or argument of its own.  (See Citibank Opp.)  Instead, Citibank states only that "it hereby joins in the memoranda [sic] of law filed by [SoGen] . . . to the extent that it raises the issue of the appropriate scope of relief with respect to the payment of interest on blocked accounts" and also joins in the memorandum of law filed "by the [JPMorgan] and [BNYM parties] to the extent it draws the Court's attention to the recent decisions, filings and pending appeals on the issue of electronic fund transfers cited therein."  (Id. at 1-2.)

[5] The Banks also named as third-party Defendants other Iranian Judgment Creditors who the Banks had reason to believe might assert a claim against the Phase Two Blocked Assets. (See J. Creditors' Statement Pursuant to Local Rule 56.1 ("J. Creditors' 56.1 Stmnt.") ¶¶ 38-39, ECF No. 767.) The Banks named and served the Peterson Judgment Creditors, Rubin Judgment Creditors, Weinstein Judgment Creditors, Owens Judgment Creditors, Valore Judgment Creditors, Sylvia Judgment Creditors, Bland Judgment Creditors, Brown Judgment Creditors, Murphy Judgment Creditors, and Bennett Judgment Creditors. (See id. ¶ 39.) The Peterson Judgment Creditors waived any claim with respect to the Phase Two Blocked Assets and were dismissed from this action on December 12, 2012. (See id. ¶ 40; Letter from Liviu Vogel ("10/28/11 Vogel Ltr.") 1, ECF No. 491; Stipulation, Order, & J. of Dismissal as to JPMorgan Assets 1, Dec. 12, 2011, ECF No. 561: Stipulation, Order, & J. of Dismissal as to BNYM Assets 1, Dec. 12, 2011, ECF No. 562; Stipulation, Order, & J. of Dismissal as to SoGen Assets 1, Dec. 12, 2011, ECF No. 564.) The Rubin Judgment Creditors and the Weinstein Judgment Creditors failed to respond and are in default. (See Mechling Decl. ¶ 41.) The Brown and Bland Judgment Creditors, the Owens Judgment Creditors, and the Murphy Judgment Creditors have answered the third-party complaints but asserted no claims or rights to the Phase Two Blocked Assets. (See Brown & Bland Answer to BNYM Third Party Compl., ECF No. 439; Brown & Bland Answer to JPMorgan Third Party Compl., ECF No. 440; Owens Answer to BNYM Third Party Compl., ECF No. 457; Owens Answer to JPMorgan Third Party Compl., ECF No. 458; Owens Answer to Citibank Third Party Compl., ECF No. 460; Brown & Bland Answer to Citibank Third Party Compl., ECF No.462; Owens Answer to SoGen Third Party Compl., ECF No. 485; Murphy Answer to Citibank Third Party Compl., ECF No.732; Murphy Answer to JPMorgan, BNYM, SoGen Third Party Compl., ECF No. 737.) The Bennett Judgment Creditors filed an answer to the JPMorgan third-party complaint and counterclaimed against JPMorgan but did not counterclaim for a turnover of the Phase Two Blocked Assets. (See Bennett Answer to Third Party Compl. & Countercls. ¶¶ 65-82, ECF No. 716.) The Valore Judgment Creditors filed answers and counterclaimed against JPMorgan, BNYM, and Citibank. (See Valore Answer to Citibank Third Party Compl. & Countercls ("Valore Citibank Answer"), ECF No. 466; Valore Answer to BNYM Compl. & Countercls. ("Valore BNYM Answer"), ECF No. 489; Valore Answer to JPMorgan Compl. & Countercls. ("Valore JPMorgan Answer"), ECF No. 490.) The Valore Judgment Creditors' counterclaim is based upon, inter alia, writs of execution allegedly delivered to the U.S. Marshal on October 5, 2011. (See Valore Citibank Answer ¶ 75.) The Valore Judgment Creditors have not joined this motion for summary judgment, nor have they submitted any evidence to support their alleged compliance with 28 U.S.C. § 1610(c). In any case, this writ of execution is later in time than the writs of execution obtained by the Judgment Creditors who are, collectively, the moving parties in this summary judgment motion, and any claim the Valore Judgment Creditors have is therefore inferior. See Levin I, 2011 WL 812032 at *8-12.

for Turnover of Phase Two Blocked Assets ("Mechling Decl.") Exs. 24-27, Aug. 29, 2012, ECF No. 764.) Of those six commercial third-party Defendants, only one – the Central Bank of ████████████ ("CB") – filed a memorandum in opposition to the Judgment Creditors' summary judgment motion. (See ████████████████████████████████████████████ ████████████████████████████████████████. ) Although placed on notice by the Court, (see Letter to Sean Thornton, Office of Foreign Assets Control ("12/11/09 OFAC Ltr."); Letter to Harold Koh, Department of State ("12/11/09 State Dept. Ltr.")), the United States government has taken no position on this case nor appeared at any of the proceedings (see Tr. of June 21, 2011 H'rg ("Tr. 6/21/2011"), ECF No. 409, at 8-9; Tr. of Nov. 13, 2012 H'rg ("Tr. 11/13/12"), ECF No. 835, at 4-5).

For the reasons stated below, the Judgment Creditors' motion for partial summary judgment on their claims for turnover of the Phase Two Blocked Assets is granted.

## I.    BACKGROUND

The Court assumes familiarity with the factual and procedural history discussed in its March 4, 2011 Opinion and Order (the "Phase One Opinion") recognizing the Judgment Creditors' priority interest in the Phase One Assets and granting turnover of those assets. See Levin I, 2011 WL 812032, at *1-21. In brief summary, the Judgment Creditors each hold a valid, unsatisfied judgment against the Islamic Republic of Iran ("Iran"), awarded pursuant to either § 1605(a)(7) or § 1605A of the Foreign Sovereign Immunities Act ("FSIA") and registered in this District. Id. Seeking satisfaction of these judgments, the Judgment Creditors claim that they are entitled to turnover of certain assets held by the Banks and blocked by the United States

government's Office of Foreign Asset Control ("OFAC") pursuant to various blocking regulations.[6]

In its Phase One Opinion, the Court held that "the record demonstrates that the judgment [debtor], Iran, or its agencies or instrumentalities have an interest in" the Phase One deposit accounts and electronic fund transfers ("EFTs") blocked by OFAC and held at the Banks.  Id. at *18, *21.  Accordingly, the Court concluded, based on its reading of the Terrorism Risk Insurance Act ("TRIA"), FSIA § 1610(f)(1)(A), and the applicable sanctions regulations, that the Phase One Blocked Assets were subject to attachment and execution by certain Judgment Creditors in partial satisfaction of their outstanding judgments against Iran.[7]  Id. at *21.  Though the Levin Judgment Creditors filed notice of appeal of the Court's Phase One Opinion, the appeal was never briefed and the parties withdrew their appeal shortly thereafter. (See Notice of Appeal, ECF No. 332; Order Granting Mot. to Withdraw Appeal, Aug. 10, 2011, ECF No. 415.)

The Court now turns to the Judgment Creditors' claim for turnover of the Phase Two Blocked Assets, which are identified in the declaration of Curtis Mechling, Esq., counsel for the Greenbaum and Accosta Judgment Creditors.  (See Mechling Decl., Exs. 24-27.) Like the Phase

---

[6] Since January 1984, Iran has been designated a "state sponsor of terrorism" under the Export Administration Act, and is a "terrorist party" as defined under TRIA § 201(d)(4). See Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48 (2d. Cir. 2010); Export Administration Act § 2405, 50 App. U.S.C.A §§ 2401-20 (West 2004).  Further, certain entities connected to Iran are designated by OFAC to be "agencies and instrumentalities of Iran" and are placed on its Specially Designated Nationals List ("SDN List"). See United States Treasury Website, Specially Designated Nationals List, http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last updated Sept. 6, 2013) ("SDN List").  Assets of entities placed on the SDN List must be blocked pursuant to OFAC's sanctions regulations and Presidential Executive Orders. See, e.g., Exec. Order No. 13,599, 77 Fed. Reg. 6,659 (Feb. 5, 2012); 31 C.F.R. § 595.204 (2013).

[7] In its Phase One Opinion, the Court ordered the Defendant Banks to turn over the Phase One Assets to the Accosta and Greenbaum Creditors, but not the Levin and Heiser Creditors.  Levin I, 2011 WL 812032, at *21.  The Court concluded that "[d]ue to their failure to obtain a court order under 28 U.S.C. § 1610(c) prior to serving the writs of execution on the New York Banks," the Levins writs were invalid.  Id.  In addition, the Court held that the Heiser Creditors' writ was "not capable of attaching the Bank of New York assets located in New York state because it was issued by a Maryland court and served on the Bank of New York in Maryland."  Id.,.  Accordingly, the Court held that only the Accosta and Greenbaum Creditors were entitled to a grant of partial summary judgment with respect to the Phase One Assets.  Id.  As for the Phase Two Blocked Assets, it is the Court's understanding that, as part of settlement discussions following the Phase One Opinion, the Judgment Creditors have worked out priority of interest amongst themselves.  (See 8/16/12 Tr. at 15-16.)

One Blocked Assets, the Phase Two Blocked Assets held by the Banks consist of assets held at

the Banks and blocked by OFAC.  The Banks disclaim any interest in these assets but

nevertheless raise issues concerning the Judgment Creditors' legal entitlement to turnover.

## II.  LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The moving party holds the initial burden of

demonstrating that there is no genuine issue of material fact.  F.D.I.C. v. Great American Ins.

Co., 607 F.3d 288, 292 (2d Cir. 2010).  When the moving party has met this initial burden, the

opposing party must set forth specific facts showing that there is a genuine issue for trial, and

cannot rest on mere allegations or denials of the facts asserted by the movant.  Davis v. State of

New York, 316 F.3d 93, 100 (2d Cir. 2002).  The Court must "view the evidence in the light

most favorable to the non-moving party, and may grant summary judgment only when no

reasonable trier of fact could find in favor of the non-moving party."  Allen v. Coughlin, 64 F.3d

77, 79 (2d Cir. 1995).

## III.  DISCUSSION

### A.  Whether the Phase Two Assets Are Subject to Attachment and Turnover

Under the law of the case doctrine, where "a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case."

Pepper v. United States, 131 S. Ct. 1229, 1250 (2011); see also Scottish Air Int'l, Inc. v. British

Caledonian Group, PLC, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993) (stating that such prior decisions

on a legal issue create "binding precedent").  Courts should only revisit prior rulings in a case if

there are "'cogent' or 'compelling' reasons" for doing so, such as "an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" Johnson v. Holder, 564 F.3d 95, 99-100 (2d Cir. 2009).

Here, in interpreting TRIA and the FSIA to dictate that all of the Phase One Blocked Assets – including blocked EFTs held by intermediary banks – were subject to attachment and turnover, the Court's Phase One Opinion held that

> It is plainly the intention of TRIA and the FSIA to make blocked assets available to plaintiffs . . . . The nature and wording of TRIA . . . indicate[s] that Congress intended all blocked assets to be available for attachment by victims of terror. [. . . ] TRIA and the FSIA employ language subjecting any blocked assets to attachment in these circumstances.

Levin, 2011 WL 812032, at *18 (emphasis in original). As such, the Court determined that TRIA § 201 and FSIA § 1610(f)(1)(A) preempt contrary provisions in Article 4 of the Uniform Commercial Code ("UCC"), which would prevent a judgment creditor from executing on funds involved in wire transfers that have been initiated but not completed. Id. (citing Hausler v. JPMorgan Chase Bank, N.A., 740 F. Supp. 2d 525 (S.D.N.Y. 2010) ("Hausler I")); also compare TRIA § 201 and FSIA § 1610(f)(1)(A) with UCC § 4A-502.

The Phase Two Blocked Assets are of the same types as the Phase One Blocked Assets, and none of the relevant laws have been amended in the time since the Phase One Opinion was issued. As such, the law of the case doctrine suggests that the Court should similarly find that all of the Phase Two Blocked Assets are subject to attachment and turnover, including funds involved in wire transfers that were blocked before they reached the beneficiary's bank, provided that third parties have not asserted a cognizable interest in the blocked assets. See Pepper, 131 S. Ct. at 1250.

Nevertheless, the Banks argue that the Court should reconsider the holding of its Phase One Opinion with respect to the proceeds of blocked wire transfers held by intermediary banks in light of the Supreme Court's subsequent decision in Board of Tr. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 131 S. Ct. 2188 (2011) ("Stanford"), and applications of that decision by other district courts in Calderon-Cardona v. JPMorgan Chase Bank, N.A., 867 F. Supp. 2d 389 (S.D.N.Y. 2011), appeal docketed, No. 12-75 (2d Cir. Jan. 10, 2012), and Estate of Heiser v. Islamic Republic of Iran, 885 F. Supp. 2d 429 (D.D.C. 2012), appeal docketed, No. 12-7101 (D.C. Cir. Oct. 5, 2012).  But see also Hausler v. JPMorgan Chase Bank, N.A., 845 F. Supp. 2d 553 (S.D.N.Y. 2012) ("Hausler II"), appeal docketed, No. 12-1264 (2d Cir. Mar. 20, 2012).

The Court will first address whether blocked EFTs held by intermediary banks are subject to execution. The Court will then turn to whether the Phase Two Blocked Assets share a sufficient nexus with Iran to be subject to attachment and turnover.

     i.   Blocked Wire Transfers Held by Intermediary Banks Are Subject to Attachment and Turnover
          1.   Stanford and District Court Applications of Stanford

After this Court issued its Phase One Opinion, the Supreme Court decided Stanford, a patent law case that addressed, in part, the statutory interpretation of the word "of" within the context of ownership of patent rights. See 131 S.Ct. at 2193. Following the Stanford decision, several district court opinions have discussed its holding with respect to TRIA, of which three merit discussion at some length: Judge Denise L. Cote's opinion in Calderon-Cardona, 867 F. Supp. 2d 389; Judge Victor Marrero's opinion in Hausler II, 845 F. Supp. 2d 553; and Judge Royce C. Lamberth's opinion in Heiser, 885 F. Supp. 2d 429.

Stanford itself did not interpret TRIA, but rather answered the question of whether the Bayh-Dole Act "displaces the norm" that the rights to an invention generally belong to the inventor in patent cases. Stanford, 131 S. Ct. at 2192. To answer that question, the Court interpreted the phrase "invention of the contractor." Id. at 2193. Stanford University argued that this phrase was most naturally read "to include all inventions made by the contractor's employees with the aid of federal funding," a reading that would have entitled Stanford, as the employer, to rights over the patent at issue. Id. at 2196. The Court found Stanford's reading "plausible enough in the abstract," but went on to note that "patent law has always been different," and that, in patent law, the Court has rejected the idea that employment is sufficient to vest title to an employee's invention in the employer. Id. at 2196-7. Reading the Bayh-Dole Act against this backdrop, the Court went on to explain that "the use of the word 'of' denotes ownership" (internal citations omitted), and interpreted the statute to vest title to the patent in the employee rather than in his employer. Id. at 2196.

Subsequently, the Calderon-Cardona Court addressed the question of whether EFTs in which the Democratic Republic of North Korea and its main intelligence agency, the Cabinet General Intelligence Bureau, had an interest that could be attached by terrorism victims pursuant to TRIA § 201(a). 867 F. Supp. 2d at 389. Though it disposed of the case by determining that North Korea was not a "terrorist party" as defined by TRIA, see id. at 394-95, the Calderon-Cardona Court nevertheless went further and determined that TRIA did not preempt state law definitions of property ownership, id. at 401. To reach this conclusion regarding the preemptive force of TRIA, it cited Stanford for the proposition that "the use of the word 'of' denotes ownership." Id. at 399 (citing Stanford, 131 S. Ct. at 2196). Finding no definition of "property"

or "property ownership" in TRIA, the court looked not to OFAC blocking regulations, but rather to state law. Id. at 400.

By contrast, the Hausler II Court found that TRIA preempted state property law, reaffirming its previous ruling, Hausler v. JPMorgan Chase Bank, N.A., 740 F.Supp.2d 525 (S.D.N.Y. 2010) ("Hausler I"). In so holding, it emphasized "the Supreme Court's focus on the pertinent statutory context in Stanford." Hausler II, 845 F.Supp.2d at 569. Looking at TRIA within its statutory context, the Hausler II Court first found that TRIA must be read in a way that harmonizes the statute with OFAC regulations, in that case, the Cuban Assets Control Regulations ("CACRs"). The "CACRs broadly define the range of Cuban property interests subject to being blocked under OFAC's direction, and the TRIA expressly makes those blocked assets available for attachment and execution to satisfy certain judgments." Id. at 562.

Second, the Hausler II Court held that TRIA represented "Congress's recognition that federal law must provide the substantive rules governing the recovery of terrorism related judgments." Id. at 563. Third, it held that the use of state property law to dictate the range of assets executable under the TRIA would lead to divergent outcomes depending on where the physical site of the blocking of EFTs was located, and could lead to a system that could be easily manipulated by intermediary banks, "who appear unconstrained in determining where to locate the accounts created when they block an EFT." Id. Finally, the Hausler II Court held that the interpretation preferred by the garnishee banks would mean that assets could be blocked by OFAC, but then could not be reached by terrorism victims for the enforcement of judgments, "frustrat[ing the] core objective" of TRIA, to satisfy judgments held by victims of terror. Id. at 564.

Finally, the Heiser Court opinion in the District Court of the District of Columbia, addressed the question of whether Iran had an ownership interest in blocked EFTs sufficient to permit judgment creditors to attach those assets. 885 F.Supp.2d at 429. The Court found that Congress intended for the federal government to control the disposition of assets of state sponsors of terror, and that therefore federal law preempted state law. Id. at 444-45. However, the Heiser Court did not look to the OFAC regulations to determine what ownership interest was required, relying, in part, on a governmental statement of interest submitted to that court.  See id. at 441 (noting the government's argument that OFAC blocked assets are used for purposes other than attachment, including as a negotiating tool between nations, and that therefore the scope of attachment under TRIA should not be read coextensively with OFAC blocking regulations); (see also Statement of Interest of the U.S. at 12, Estate of Heiser v. Islamic Republic of Iran, 00 CV 2329 (RCL) ("Heiser Statement of Interest").) (taking no stance on the preemptive force of TRIA, but arguing that the phrase "of a terrorist party" required an ownership interest, and the nature of that ownership interest was not defined by TRIA or the OFAC regulations)).

Rather, the Heiser Court crafted federal common law to determine what ownership interest was required by TRIA § 201(a), using U.C.C. Article 4 and the common law of judgment liens to guide its determination.[8] See id. at 438 (noting that the common law historically provided that "[t]he lien of a judgment attaches to the precise interest or estate which the judgment debtor has actually and effectively in the property, and only to such interest").

---

[8] This approach was followed by a subsequent D.C. District Court decision by Judge Lamberth in Peterson v. Islamic Republic of Iran, No. 01-2094 (RCL), 2013 WL 1460188 (D.D.C. Apr. 11, 2013), appeal docketed No. 13-7086 (D.C. Cir. May 28, 2013), which held that a garnishee bank, HBUS, had committed no sanctionable conduct when it failed to disclose the existence of three blocked EFTs to judgment creditors. The garnishee bank had averred, in interrogatories, that it was not "indebted to" defendants (in that case, agencies and instrumentalities of Iran) and did not possess any of their "goods, chattels, or credits." The court held that sanctions were not appropriate because the statements were legally accurate and defendants had no possessory interest in the EFTs.

2. <u>There is no Intervening Change in the Law that Requires This Court to Diverge from its Finding that the TRIA Preempts State Law</u>

Upon a thorough review of the cases cited by the Banks and the Judgment Creditors, this Court does not find any "'cogent' or 'compelling' reasons," <u>Johnson</u>, 564 F.3d at 99-100, to revisit its prior holding. More specifically, there has been no intervening change in law that alters this Court's holding that the phrase "blocked assets of that terrorist party," when read within the statutory context of the TRIA, "indicate[s] that Congress intended all blocked assets be available for attachment by victims of terror." <u>Levin I</u>, 2011 WL 812032, at *18. This Court's prior holding that TRIA preempts state law is therefore affirmed.

First, the case law cited by the Banks and the Judgment Creditors shows that the language of TRIA § 201(a) must be interpreted in light of the "nature and wording of the statute." <u>See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.</u>, 609 F.3d 111, 116 (2d Cir. 2010) ("Whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought."). For example, <u>Stanford</u> instructs that the interpretation of a statute is highly dependent on the context in which it is written. Though the Court explained its decision, in part, by saying that "the use of the word 'of' denotes ownership," <u>Stanford</u>, 131 S.Ct. at 2196, it also made clear that it was interpreting the patent statute in light of the 220 years of patent law since the first Patent Act, and further noted that the interpretation of the phrase "invention of the contractor" proposed by Stanford University, while otherwise a plausible interpretation, would represent a "sea change in intellectual property rights." <u>Id.</u> at 2199.

The phrase "of that terrorist party," found in TRIA § 201(a) should therefore be interpreted within the context of the OFAC regulations and in a manner consistent with the remedial purpose of the statute. First, TRIA § 201 refers to OFAC regulations implemented

pursuant to the Trading With the Enemy Act ("TWEA") and the International Emergency

Economic Powers Act ("IEEPA"), showing Congress' intent that the statutes be considered

together. See Levin I, 2011 WL 812032 at *15 (noting that TRIA § 201(d)(2) defines "blocked

assets" by reference to the TWEA and IEEPA, and finding that "federal law comprehensively

addressed property rights in this context") (citing Hausler I, 740 F.Supp.2d at 531.). The OFAC

blocking regulations implemented pursuant to the TWEA and IEEPA broadly define the interest

in property that a terrorist party must have in certain assets before they may be blocked. See, e.g.,

31 C.F.R. § 544.201 ("all property and interests in property that are in the United States…are

blocked"); 31 C.F.R. § 544.305 (defining an "interest in property" as "an interest of any nature

whatsoever, direct or indirect"). Legislating against the backdrop of broadly worded OFAC

regulations, Congress worded TRIA broadly, thus subjecting all assets blocked under OFAC

regulations to attachment by terror victims holding valid judgments.

That Congress intended to render blocked assets attachable rather than leaving them

blocked or frozen is in line with the remedial purpose of TRIA, and such an intent is evident in

the legislative history.[9] Senator Tom Harkin, a sponsor of the Act, stated, "Making the state

---

[9] The United States government, in an amicus brief before the Second Circuit and a statement of interest before the Heiser Court, argues that both TRIA and FSIA § 1610(g) require an ownership interest. (See Heiser Statement of Interest; Brief for the United States as Amicus Curiae at 15, JPMorgan Chase, N.A. v. Hausler, No. 12-1264 ("Hausler Amicus Br.").) This Court has never held otherwise, although the Phase One Opinion held, and its holding is affirmed here, that the nature of that ownership interest is defined by the OFAC regulations rather than by reference to state law. The government goes on to argue for the strategic importance of allowing some assets blocked pursuant to OFAC regulations to be unattachable. In part, the government argues that these blocked assets are used for leverage for international negotiations. (See Hausler Amicus Br. at 23.)

This Court has no statement of government interest before it, although the Executive Branch was invited to participate in this action. (See 12/11/09 OFAC Ltr.; 12/11/09 State Dept. Ltr.; Tr. 6/21/2011 at 8-9; Tr. 11/13/12 at 4-5.) Its statements of interest in separate actions will be accorded no deference. See Republic of Altmann v. Austria, 541 U.S. 677, 701-2 (2004) (rejecting the United States government's interpretation of FSIA when it is a matter of "pure question of statutory construction…well within the province of the Judiciary" and finding that the United States' views "merit no special deference"); Hausler I, 740 F.Supp.2d at 537 (noting that "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there, notwithstanding any contrary interpretation by the Executive Branch"). Any statement from the Executive Branch submitted with

sponsors [of terrorism] actually lose billions of dollars will more effectively deter future acts of

terrorism than keeping their assets blocked or frozen in perpetuity." 148 Cong. Rec. S11524-01

(daily ed. Nov. 19, 2002) (statement of Sen. Harkin), 2002 WL 31600115. Permitting assets to

be blocked under OFAC regulations but not attached by victims of terror holding valid

judgments would frustrate Congress' purpose of "deal[ing] comprehensively with the problem of

enforcement of judgments issued to victims of terrorism." H.R. Rep. No.107-779, at 27 (2002),

reprinted in 2002 U.S.C.C.A.N. 1430, 1434; see also Hausler II, 845 F.Supp.2d at 563 (holding

that TRIA represents "Congress's recognition that federal law must provide the substantive rules

governing the recovery of terrorism related judgments").

 Here, there is no dispute that the Judgment Creditors are victims of terror holding valid

judgments against Iran. (See J. Creditors' 56.1 Stmnt. ¶¶ 16-32.) There is also no dispute that the

Banks are in possession of assets blocked pursuant to OFAC regulations. (See id. ¶ 33; see also

Citibank N.A.'s Resp. to J. Creditors' 56.1 Statement ("Citibank's 56.1 Stmnt.") ¶ 33, ECF No.

814; JPMorgan's Resp. to J. Creditors' 56.1 Statement ("JPMorgan's 56.1 Stmnt.") ¶ 33, ECF

No. 807; BNYM's Resp. to J. Creditors' 56.1 Statement ("BNYM's 56.1 Stmnt.") ¶ 33, ECF No.

808.) The Banks argue, however, that permitting execution of judgments on these blocked assets

would lead to unfair burdens on innocent third parties, who have only the most attenuated

connection to Iran. (See, e.g., JPMorgan Opp. at 3-6.) The Court has given all potentially

interested parties the opportunity to appear and make this argument themselves, (see Mechling

Decl., Exs. 1, 24-27, 29) though not all district courts considering similar attachment actions

---

respect to the TRIA should be considered suspect, given that Congress' passage of TRIA was over the objection of
the Executive Branch and for the purpose of rendering blocked assets attachable. See In re Islamic Republic of Iran
Terrorism Litig., 659 F.Supp.2d 31, 58 ("[T]he TRIA appears to represent something of a victory for these terrorism
victims – whose interests have been most vigorously advanced by members of Congress – over the longstanding
objections of the Executive Branch.").

have chosen to do so, compare Calderon-Cardona, 867 F.Supp.2d at 393 (ruling on the question

of whether EFTs were attachable before providing notice to potentially interested third parties)

and Heiser, 885 F.Supp.2d at 434, 449 (same) with Levin I, 2011 WL 812032 at *18-19 (noting

previous entry of an order authorizing third-party interpleader complaints against assets in

controversy). See also Gates v. Syrian Arab Republic, Nos. 11 C 8715, 11 C 8913, 12 C 1836, 12

C 2983, 2013 WL 1337223, at *10 (N.D. Ill. Mar. 29, 2013) (declining to resolve which parties

had an ownership interest in EFTs without first interpleading interested parties, noting that "the

best way to determine the details of the transition of the funds at issue in this case is to notify

those who may be involved in the transit…and provide them an opportunity to appear and object

to any turnover of the funds").

Of all those interpleaded, only six commercial third-party Defendants who were parties to

the wire transfers at issue have responded to this action. (See Mechling Decl., Exs. 24-27.) Of

those, only one has sought a license from OFAC. (See Letter from ████████████ 1, Apr. 15,

2013 (notifying the Court that ████████████ has a pending application before OFAC for a

license releasing the blocked funds transferred to the ████████████ from ████████████).) This

Court is satisfied that all those with potential interests in Phase Two Blocked Assets have been

given notice in this case and, provided that the entities involved are "agencies or

instrumentalities of Iran," as addressed below, their assets should be attachable by valid

judgment holders under TRIA § 201(a).

The interpretation of TRIA § 201(a) advanced by the Banks is divorced both from the

context of the OFAC regulations and from the remedial purpose of the statute. Arguing that the

phrase "of that terrorist party" requires ownership of the asset as defined by New York state law,

the Banks rely on "the usual rule in judgment enforcing proceedings," (JPMorgan Opp. at 7

(citing 30 AM. JUR. 2D Executions § 120 (2013))), and on the Stanford Court's statement that

"the use of the word 'of' denotes ownership" (JPMorgan Opp. at 7 (citing Stanford, 131 S. Ct. at

2196)). See also Calderon-Cardona, 867 F.Supp.2d at 399-400 (citing Stanford in its holding that

TRIA requires an ownership interest as defined by New York state law); Heiser, 885 F.Supp. 2d

at 438 (looking to the historical common law of judgment liens in its interpretation of TRIA).

However, by overlooking the purpose of TRIA and the implementing regulations to which the

statute refers, the Banks advance an approach that "is inconsistent with the Supreme Court's

focus on the pertinent federal statutory context in Stanford." Hausler II, 845 F. Supp. 2d at 568.

Finally, the Bank's interpretation is not necessary to give meaning to the phrase "blocked

assets of that terrorist party." As Judge Marrero of this District explained, TRIA is broad in

scope, encompassing various terrorist entities and blocking regulations. Therefore, the phrase "of

that terrorist party" provides "the necessary, though perhaps perfunctory, instruction that the

'blocked assets' available for execution are only those assets blocked pursuant to the particular

regulation or administrative action directed at the particular terrorist-party judgment debtor."

Hausler II, 845 F. Supp. 2d at 567.

> ii.  EFTs Are Subject To Attachment Under TRIA § 201(a) and FSIA § 1610(g)

Upon a review of the case law decided after this Court's Phase One Opinion, this Court

does not find any "cogent" or "compelling" reasons, Johnson, 564 F.3d at 99-100, to revisit its

prior holding that TRIA preempts state law. More specifically, there has been no intervening

change in law that alters this Court's holding that the phrase "blocked assets of that terrorist

party," when read within the statutory context of TRIA, "indicate[s] that Congress intended all

blocked assets be available for attachment by victims of terror." Levin I, 2011 WL 812032, at

*18. This Court therefore finds, as it did in its Phase One Opinion, that blocked EFTs held by intermediary banks are subject to execution under TRIA.

Given the fact that blocked EFTs held by intermediary banks are subject to execution under TRIA, the Court need not address whether FSIA § 1610(g) [10] would independently provide a basis for preemption of state law and execution of blocked EFTs. It should be noted, however, that FSIA § 1610(g) does not mandate a different result than the one reached here. In fact, the two statutes should be read together, and "reading TRIA § 201 and FSIA § 1610(g) in conjunction with the entire FSIA and the 2008 NDAA amendments shows that Congress

---

[10] 28 U.S.C. § 1610(g) provides:

(g) Property in certain actions.--
(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--
    (A) the level of economic control over the property by the government of the foreign state;
    (B) whether the profits of the property go to that government;
    (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
    (D) whether that government is the sole beneficiary in interest of the property; or
    (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.
(2) United States sovereign immunity inapplicable.--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.
(3) Third-party joint property holders.--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1610.

17

intended to create a harmonious whole."[11] Heiser, 885 F.Supp.2d at 445. See also Levin I, 2011

WL 812032 at *10 (considering both the pre- and post-2008 versions of the FSIA and noting that

TRIA is codified as a note to FSIA §1610, and must be read in the context of the overarching

statutory scheme of the FSIA). Reading the two statutes together and in the context of the larger

statutory scheme, the Court affirms its Phase One Opinion holding that blocked EFTs held by

intermediary banks are subject to execution.

     iii.   Whether Phase Two Assets Are Assets or Property of an Agency or
          Instrumentality of Iran

     In order for the Phase Two Blocked Assets to be subject to attachment and turnover, the

Judgment Creditors' motion must comply with C.P.L.R. § 5225(b), as required by Federal Rule

of Civil Procedure 69.  To be entitled to turnover of the assets, the Judgment Creditors must have

provided sufficient evidence to prove that the entities whose assets have been blocked are

"agencies and instrumentalities of Iran," as defined by 28 U.S.C. § 1603(b), and that those

entities are entitled to the possession of these funds, but for the blocked nature of the assets.[12]

---

[11] FSIA §1610(g) was one of a series of amendments made to the FSIA in 2008 after Congress enacted TRIA in 2002; the 2008 amendments revised the immunity provisions related to terrorist states, created an express cause of action against state sponsors of terrorism that engaged in terrorist acts, and created FSIA § 1610(g), the execution provision. See National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181 § 1083(a)(1) & (b)(3)(D) (2008) (codified at 28 U.S.C. §§ 1605A & 1610(g)). In relevant part, FSIA § 1610(g) permits judgment creditors holding judgments entered under § 1605A, as the Judgment Creditors in this action are, to attach "the property of a foreign state against which a judgment is entered…and the property of an agency or instrumentality of such a state."

[12] 28 U.S.C. § 1603(b) provides:

    For the purposes of this charter…

      **(b)** An "agency or instrumentality of a foreign state" means any entity--
      **(1)** which is a separate legal person, corporate or otherwise, and
      **(2)** which is an organ of a foreign state or political subdivision thereof, or a majority of whose
      shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
      **(3)** which is neither a citizen of a State of the United States as defined in section 1332(c) and
      (e) of this title, nor created under the laws of any third country.

See Levin I, 2011 WL 812032, at *18 (citing Weininger v. Castro, 462 F.Supp.2d 457, 499 (S.D.N.Y. 2006)).

Neither the Banks nor any of the commercial third-party Defendants have presented evidence to suggest that the entities discussed below are not agencies or instrumentalities of Iran. (See Decl. of Kelly Nevling in Supp. of JPMorgan's Resp. to Phase Two Mot. ("Nevling JPMorgan Decl.") ¶¶ 11-32, Oct. 15, 2012, ECF No. 805 (contesting whether entities were sufficiently connected to blocked assets, but not contesting their presence on the SDN List); Decl. of Kelly Nevling in Supp. of BNYM's Resp. to Phase Two Mot. ("Nevling BNYM Decl.") ¶¶ 8-20, Oct. 15, 2012, ECF No. 806 (same).)  However, as the Judgment Creditors are the moving party, they bear the burden of presenting sufficient evidence to demonstrate that there is no issue of material fact as to the availability of these assets for turnover. See Levin I, 2011 WL 812032, at *19 (citing Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995)).

As they did in the Phase One Opinion, the Judgment Creditors rely heavily on an affidavit presented by Dr. Patrick Clawson, a Deputy Director for Research of the Washington Institute for Near East Policy. (See Aff. of Dr. Patrick Clawson ("Clawson Aff.") ¶ 2, Aug. 29, 2012, ECF No. 763.)  This Court noted in its Phase One Opinion that "Dr. Clawson has extensive experience researching and consulting with government officials about Iran, and has published several books on the subject," and, therefore, the Court accepted Dr. Clawson's expertise in this area. Levin I, 2011 WL 812032 at *19. In examining the evidence presented by the Judgment Creditors here, the Court similarly accepts Dr. Clawson as an expert.

---

28 U.S.C. § 1603.

1.   Citibank Phase Two Blocked Assets

The Judgment Creditors seek a turnover of twenty-three blocked assets held by Citibank (the "Citibank Phase Two Blocked Assets"). (See Mechling Decl., Ex. 24.)  Citibank does not contest that the entities party to these transfers are agencies and instrumentalities of Iran. (See Citibank's 56.1 Stmnt ¶ 66 ("Citibank lacks information sufficient to respond to this assertion of undisputed material fact and refers the Court to the relevant paragraphs in the Clawson Affidavit.").)  These assets include wire transfers in which the following entities were the ordering customer, remitter's bank, beneficiary's bank, or the beneficiary: (a ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████. (See Phase Two Mot. at 17-18; Mechling Decl. Ex. 24.)

Of these entities, this Court has already held that ████████ and ████████ are agencies and instrumentalities of Iran, and that holding is affirmed here.  See Levin I, 2011 2011 WL 812032 at *19-20.  Of the remaining banking entities, Dr. Clawson states that ██████████████████████████████████████████████████████; and █████████████ are all owned by Iran, are national banks of Iran, are controlled by Iran, are agencies or instrumentalities of Iran, or are alter-egos of Iran. (See Clawson Aff. ¶¶ 24, 27, 32, 33, 35, 36.) This contention is supported by, and the Court has independently verified, the fact that each bank is on the SDN List maintained by OFAC and is designated for sanctions. See generally SDN List, supra note 6 (listing █████████████ as subject to sanctions).

Further, according to Dr. Clawson's affidavit, ████████████ is a wholly owned subsidiary of ████████████, which is an agency or instrumentality of Iran, controlled by Iran, owned by Iran, or an alter-ego of Iran. (See Clawson Aff. ¶ 29.) To support this contention, Dr.

Clawson refers to the SDN List as well as a press release from the Treasury Department available online. See SDN List, supra note 6; see also ███████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████.

Finally, according to Dr. Clawson's affidavit, it is common knowledge among experts in international banking and commerce that ██████████ is owned by Iran, is controlled by Iran, is an agency or instrumentality of Iran, or is an alter ego of Iran. (See Clawson Aff. ¶34.) Further, the wire transfer to which ██████████ was the intended beneficiary, Citibank transfer number four, also included ██████████ as a party to the transfer, acting as the intended beneficiary bank. (See Mechling Decl. Ex. 24.) As discussed above, ██████████ is also an agency or instrumentality of Iran, listed on OFAC's SDN List and is subject to blocking sanctions. (See Clawson Aff. ¶ 27.)

This Court finds that the Judgment Creditors have presented sufficient evidence, through the affidavit of their expert, Dr. Clawson, and independently-verifiable online resources, that the entities associated with the Citibank Phase Two Blocked Assets are agencies and instrumentalities of Iran sufficient to meet the requirements of 28 U.S.C. § 1603(b).

2.  JPMorgan Phase Two Blocked Assets

The Judgment Creditors seek a turnover of twenty-two blocked assets held by JPMorgan (the "JPMorgan Phase Two Blocked Assets"). (See Mechling Decl., Ex. 26.) JPMorgan has not presented any evidence to contest the Judgment Creditor's assertion that the entities involved are agencies and instrumentalities of Iran, (see JPMorgan's 56.1 Stmnt. ¶ 66 ("The Court must determine whether the Moving Parties have satisfied their burden of proof with respect to these allegations.")), instead arguing primarily that the parties to the EFTs did not exert a sufficient

ownership interest over blocked assets to render them attachable, arguments that the Court addressed above (<u>see</u> Nevling JPMorgan Decl. ¶¶ 11-32). These assets include deposit accounts and wire transfers in which the following entities were designated to be the ordering customer, remitter's bank, beneficiary's bank, the beneficiary, or another entity involved in the transfer: (a) ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████. (<u>See</u> Phase Two Mot. at 18; Mechling Decl. Ex. 26.)

Of the entities affiliated with the JPMorgan Phase Two Blocked Assets, four have already been held by this Court to be agencies or instrumentalities of Iran: ███████████. <u>See</u> <u>Levin I</u>, 2011 2011 WL 812032 at *19-20. That holding is affirmed here. In considering the Citibank Phase Two Assets, above, this Court found that sufficient evidence had been presented to show that ███████████ are agencies and instrumentalities of Iran for the purposes of 28 U.S.C. § 1603(b), and that finding extends to the JPMorgan Phase Two Blocked Assets in which those parties have an interest.

According to Dr. Clawson's affidavit, it is common knowledge among experts in international banking and commerce, and it is his expert opinion, that ███████████[13], ███████████, are all owned by Iran, controlled by Iran, are agencies or instrumentalities of Iran, or are alter-egos of Iran. (<u>See</u> Clawson Aff. ¶¶ 23, 30, 31, 38.) In support of this contention, Dr. Clawson refers to the SDN List, which, as has been independently verified by the Court, lists those entities as subject to OFAC sanctions. <u>See generally</u> SDN List, <u>supra</u> note 6 (listing ███████████ as subject to sanctions).

███████████ is not mentioned in Dr. Clawson's affidavit. Though an independent search shows that ███████████ was added to OFAC's SDN List on December 2, 2010, that

---

[13] ███████████



evidence was not presented to the Court by the Judgment Creditors. See ████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.

However, JPMorgan transfer thirteen, the transfer for which ██████████ was the crediting bank, also had as a party to the transfer the ██████████, which was the beneficiary's bank. (See Mechling Decl., Ex. 26.) As discussed above, ██████████ is found on the SDN List and described by Dr. Clawson as an agency or instrumentality of Iran. (See Clawson Aff. ¶ 23.) Thus, the Judgment Creditors have presented sufficient evidence to show that an agency or instrumentality of Iran is a party to wire transfer thirteen.

This Court therefore finds that the Judgment Creditors have presented sufficient evidence, through the affidavit of their expert, Dr. Clawson, and independently-verifiable online resources, that the entities associated with the JPMorgan Phase Two Blocked Assets are agencies and instrumentalities of Iran sufficient to meet the requirements of 28 U.S.C. § 1603(b).

### 3. BNYM Phase Two Blocked Assets

The Judgment Creditors seek a turnover of twelve blocked assets held by BNYM (the "BNYM Phase Two Blocked Assets"). (See Mechling Decl. Ex. 25.) BNYM  has not presented any evidence to contest the Judgment Creditor's assertion that the entities involved are agencies and instrumentalities of Iran, (see BNYM's 56.1 Stmnt. ¶ 66 ("The Court must determine whether the Moving Parties have satisfied their burden of proof with respect to these allegations.")), instead arguing primarily that the parties to the EFTs did not exert a sufficient ownership interest over blocked assets to render them attachable, arguments that the Court addressed above (see Nevling BNYM Decl. ¶¶ 8-20). These assets include wire transfers in which the following entities were the ordering customer, remitter's bank, beneficiary's bank, the



beneficiary, or another entity involved in the transfer: (a) ██████████████████

████████████████████████████████████████████████████████

███████████. (See Phase Two Mot. at 18; Mechling Decl. Ex. 25.)

Of the entities affiliated with the BNYM Phase Two Blocked Assets, three have already

been held by this Court to be agencies or instrumentalities of Iran: ███████████. See Levin I,

2011 2011 WL 812032 at *19-20. That holding is affirmed here. In considering the Citibank

Phase Two Assets, above, this Court found that sufficient evidence had been presented to show

that ██████████ are agencies and instrumentalities of Iran for the purposes of 28 U.S.C.

§ 1603(b), and that finding extends to the BNYM Phase Two Blocked Assets in which those

parties have an interest.

According to Dr. Clawson's affidavit, it is common knowledge among experts in

international banking and commerce, and it is his expert opinion, that ██████████ is owned

by Iran, controlled by Iran, is an agency or instrumentality of Iran, or is an alter-ego of Iran. (See

Clawson Aff. ¶ 28.) In support of his opinion, Dr. Clawson cites the SDN List and another online

resource, both of which have been independently verified by the Court. See SDN List, supra note

6 (listing ██████████ as subject to sanctions); see also Wisconsin Project on Nuclear Arms

Control, Featured Iranian Entities: ██████████, IRAN WATCH (Last Modified Sept. 3, 2010)

██████████ (discussing the American sanctions to which ██████████ is subject and the

UN resolutions discussing the entity's attempts to evade sanctions).

Dr. Clawson's affidavit does not discuss ██████████, which was a party to BNYM

blocked transfer number six. (See Mechling Decl. Ex. 25 (listing ██████████ as "other entity

involved").) Though ██████████ is listed as subject to secondary sanctions on OFAC's SDN

List, such evidence was not presented by the Judgment Creditors. See SDN List, supra note 6.

24

However, the Judgment Creditors do present evidence with respect to an entity that was also party to transfer number six as the intended beneficiary of the transfer, ███████ (See Mechling Decl. Ex. 25.) According to Dr. Clawson's affidavit ██████ is owned by Iran, controlled by Iran, is an agency or instrumentality of Iran, or is an alter-ego of Iran. (See Clawson Aff. ¶ 37.) As the Court has independently verified, ██████ is on the SDN List. See SDN List, supra note 6 (listing ████████ as subject to secondary sanctions). Therefore, the Judgment Creditors have presented sufficient evidence to show that an agency or instrumentality of Iran is a party to wire transfer six.

This Court therefore finds that the Judgment Creditors have presented sufficient evidence, through the affidavit of their expert, Dr. Clawson, and independently-verifiable online resources, that the entities associated with the BNYM Phase Two Blocked Assets are agencies and instrumentalities of Iran sufficient to meet the requirements of 28 U.S.C. § 1603(b).

#### 4.  SoGen Phase Two Blocked Assets

The Judgment Creditors seek a turnover of three blocked assets held by SoGen (the "SoGen Phase Two Blocked Assets"). (See Phase Two Mot. at 19.) One asset comprises the proceeds of one blocked deposit account held in the name of ████████. (See id.; Mechling Decl., Ex. 27.) The other two assets are blocked EFTs to which ████████ respectively, were parties. (See Mechling Decl., Ex. 27.) SoGen took no position on the ownership of any of the Phase Two Blocked Assets, and did not oppose the Judgment Creditors' motion for turnover. (See SoGen Opp. at 1.)

This Court held, in its Phase One Opinion, that ████████ are agencies or instrumentalities of Iran. See Levin I, 2011 2011 WL 812032 at *19-20. That holding is affirmed here. Further, in Dr. Clawson's expert opinion, ████████ is a national bank of Iran and an

agency or instrumentality of Iran. (See Clawson Aff. ¶ 26). ██████████ is also on OFAC's

SDN List, a fact that has been independently verified by the Court. See SDN List, supra note 6

(listing all offices of ██████████ worldwide as subject to secondary sanctions).

This Court therefore finds that the Judgment Creditors have presented sufficient

evidence, through the affidavit of their expert, Dr. Clawson, and independently-verifiable online

resources, that the entities associated with the SoGen Phase Two Blocked Assets are agencies

and instrumentalities of Iran sufficient to meet the requirements of 28 U.S.C. § 1603(b).

In sum, given the evidence presented by Judgment Creditors, the record demonstrates that

the entities that were party to EFT transfers or deposit accounts which comprise the Phase Two

Blocked Assets are agencies or instrumentalities of Iran as defined by 28 U.S.C. § 1603(b). The

Court finds that the Judgment Creditors' motion complies with C.P.L.R. § 5225(b), as required

by Federal Rule of Civil Procedure 69, and the Judgment Creditors are entitled to turnover of the

Phase Two Blocked Assets.

## IV.    INTERESTS OF COMMERCIAL THIRD-PARTY DEFENDANTS

Given that, under TRIA and FSIA § 1610(g), Phase Two Blocked Assets are subject to

attachment, the next issue to address is the conflict between asserted ownership interests of

commercial third-party defendants and claims asserted by the Judgment Creditors. [14] In this case,

the commercial third-party Defendants have not presented an interest in the Phase Two Blocked

Assets, cognizable under TRIA and FSIA § 1610(g), which is superior to that of the Judgment

Creditors. Therefore, the Judgment Creditors hold the superior interest to the Phase Two Blocked

Assets.

---

[14] The Levins, Greenbaum, Acosta, and Heiser Judgment Creditors have entered into a confidential settlement
agreement resolving their dispute regarding priority, as between them, to the Blocked Assets at issue in this matter
and providing for the distribution of proceeds therefrom. (See Mechling Decl. ¶ 38.)

The objective of the TRIA "is to give terrorist victims who actually receive favorable judgments a right to execute against assets that would otherwise be blocked." Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York, 346 F.3d 264, 271 (2d Cir. 2003). Thus, "any evaluation under the TRIA of the priority of interests in the [Phase Two Blocked Assets] must begin with the understanding that 'terrorist victims' holding judgments, as a group, must be first in line." Hausler II, 845 F.Supp.2d at 569.

Further, this Court's Phase One Opinion held that FSIA § 1610(c) provides the procedure to be followed by plaintiffs seeking to execute or attach the property of a foreign sovereign or an agency or instrumentality of a foreign sovereign. Levin I, 2011 WL 812032 at *7. Here, the Judgment Creditors hold valid writs of execution in compliance with the procedural requirements of § 1610(c). (See Mechling Decl. Exs. 3-4, 6-7, 9-10, 12-13, 15-16, 20-23.)

By contrast, commercial parties asserting a claim to blocked assets pursuant to the statutory scheme of TRIA and FSIA § 1610 are not given priority over terrorism victims holding valid judgments in attachment proceedings. Rather, the proper avenue for redress for commercial third-party Defendants is through OFAC's administrative procedures. See 31 C.F.R. § 501.806 (specifying "procedures for unblocking funds believed to have been blocked due to mistaken identity"); Hausler II, 845 F.Supp.2d at 570 (noting that "Congress drafted the TRIA against the backdrop of statutory and regulatory provisions… which require licenses to unblock; this restriction suggests that the TRIA should be read in consideration of these alternative opportunities for parties without terrorism-related judgments to assert interests in blocked assets"). If parties dispute OFAC decisions, they may seek judicial review. See id. at 570 (citing Zarmach Oil Services v. U.S. Dep't of the Treasury, 750 F.Supp.2d 150 (D.D.C. 2010)).

Further, granting terrorism victims priority of interest over third parties claiming an ownership interest in blocked assets is consistent with the purpose of the TRIA. The TRIA was implemented in order to "punish and impose a heavy cost on those aiding and abetting the terrorists." 148 Cong. Rec. S11524-01 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin), 2002 WL 31600115. It would undermine that purpose if, without successful utilization of OFAC's administrative procedures, "foreign banks doing business with the instrumentalities of a terrorist state were found to have a superior interest in the frozen assets as compared to that of a holder of a judgment against that very terrorist state." Hausler II, 845 F.Supp.2d at 570.

Here, six commercial third-party Defendants have asserted a claim to the EFTs to which they were parties.[15] All of the commercial third-party Defendants were party to wire transfers that were blocked by OFAC because one of the parties to the transfer was on the SDN list. The proper recourse for these commercial third-party Defendants is through OFAC administrative procedures.[16] Of those six, only two third-party Defendants have demonstrated an intent to seek

---

[15] Three commercial third-party Defendants named in the Citibank third-party complaint – the ██████████ – have asserted claims to the proceeds of EFTs to which each was a party. (See ██████████) One commercial third-party defendant named in the BNYM third-party complaint – ██████████ – asserted a claim to the wire to which it was a party. (See Answer to Am. & Supplemental Third-Party Compl. Of BNYM ██████████"), ECF No. 521.) Two commercial third-party defendants named in the JPMorgan third-party complaint – CB, whose arguments are addressed above, and ██████████ – asserted a claim to the wires to which they were parties. (See Central Bank of ██████████ Answer to Additional Am. Third-Party Compl. of JPMorgan Chase Parties ("CB Answer"), ECF No. 655; Mechling Decl., Ex. 26 (referencing a Jan. 22, 2012 letter submitted to counsel from ██████████ asserting a claim).)

[16] CB argues that its blocked transfer is distinguishable from the other EFTs considered here because its transfer was blocked after CB sent a payment order to JPMorgan, where CB's deposit account was located, but before the transfer reached an intermediary bank. (See CB Opp. at 12.) The beneficiary bank to which the transfer was directed was ██████████, an entity whose assets are blocked by OFAC. (See Decl. of Richard L. Pollock ¶ 6 ("Pollock Decl."), Oct. 15, 2012, ECF No. 802.) Upon discovering that a party to the transfer was subject to OFAC blocking regulations, JPMorgan was legally required to transfer the funds to a blocked account. See 31 C.F.R. § 544.203. To the extent that CB contests that the transfer was improperly blocked by OFAC, the proper procedure is to apply for a license from OFAC. Although CB has stated that it "intends" to seek such a license, there is no evidence before this Court that it has actually done so. (See ██████████) Until such time as OFAC grants such a license, there is no reason to doubt that the assets were properly blocked in accordance with OFAC blocking regulations. Since this Court affirms its Phase One Opinion holding that TRIA § 201(a) "indicate[s] that Congress intended all blocked assets be available for attachment by victims of terror," CB's assets are properly considered as subject to attachment here. Levin I, 2011 WL 812032, at *18.

an unblocking of assets through the requisite OFAC procedures, and only one has actually done so. (Compare ▮▮▮▮ Decl. ¶ 11 (stating that the CB intends to apply to the Office of Foreign Assets Control for a license authorizing the release of blocked funds), with Letter from ▮▮▮▮ 1, Apr. 15, 2013 (notifying the Court that the ▮▮▮▮ has a pending application before OFAC for a license releasing the blocked funds transferred to ▮▮▮▮). The inclusion in this Order of funds pending before OFAC is conditioned upon the denial of the OFAC license.

Because the Judgment Creditors are holders of valid judgments eligible for execution under the TRIA, the Judgment Creditors' joint interest is superior to the interests of commercial third-party Defendants who have not resorted to OFAC regulatory procedures.

### A. Whether the Central Bank Assets Are Immune from Execution

CB opposes this summary judgment motion with respect to one blocked transfer in the amount of ▮▮▮▮. (See CB Opp. at 5.) On August 31, 2009, CB directed JPMorgan to implement a wire transfer in the amount of €233,716.00 to an Iranian engineering firm with an account at ▮▮▮▮. (See Decl. of ▮▮▮▮ ¶ 7, ("▮▮▮▮ Decl."), Oct. 15, 2012, ECF No. 800.) On September 17, 2009, in accordance with the payment order, JPMorgan debited CB's U.S. dollar deposit account in New York in the sum of ▮▮▮▮ and converted such funds to Euros at its U.K. branch for payment to the Iranian recipient in accordance with CB's instructions. (See Pollock Decl., Ex. A at p. 404-05.) On September 18, 2009, the U.K. JPMorgan branch recognized that ▮▮▮▮ was an entity subject to OFAC blocking regulations, and the assets were transferred into a frozen account. See 31 C.F.R. § 544.203; (See Pollock Decl. ¶ 6.)

Here, CB contests the attachment of the blocked transfer. CB argues that, as a foreign central bank, (see ████████████████), its funds are immune from execution under FSIA § 1611(b)(1). CB argues that the central bank immunity provided by this section preempts TRIA and FSIA § 1610(g). (See CB Opp. at 6-9.) CB's argument fails. Even if CB's assets did fall under the protection of FSIA § 1611(b)(1), that immunity is overridden by the subsequently enacted TRIA § 201(a).[17] See Weininger, 462 F.Supp.2d at 457 ("TRIA, which was enacted later in time than § 1611, overrides the immunity conferred in § 1611."); Peterson v. Islamic Republic of Iran, No. 10 CV 4518 (KBF), 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ("TRIA trumps the central bank provision in 28 U.S.C. § 1611(b)(2)."); Gates, 2013 WL 1337223 .

### i.   The Interplay Between TRIA § 201 and 28 U.S.C. § 1611

The FSIA provides immunity from attachment and execution of property to the property of a foreign central bank in FSIA § 1611(b)(1).[18] That section provides exceptions to waivers of sovereign immunity for foreign central banks "notwithstanding the provisions of section 1610 of this chapter." TRIA § 201(a), in turn, authorizes attachment of blocked assets of terrorist parties "notwithstanding any other provision of law." Because the TRIA was codified as a note to FSIA

---

[17] Funds deposited in a bank in the United States may benefit from central bank immunity if the funds belong to a foreign central bank and are held for the bank's own account. NML Capital Ltd. v. Banco Central de la Republica Argentina, 622 F.3d, 172, 194 (2d Cir. 2011), cert denied, 133 S. Ct. 23 (2012). Here, Judgment Creditors allege that CB's transfer may not benefit from central bank immunity because it was in transit to ███████ when it was blocked, (see Pollock Decl., Ex. A at p. 404-05), not sitting in the deposit account of CB, as CB alleges (see CB Opp. at 12).  There is no need to reach this issue here, because TRIA  trumps central bank immunity in any event.

[18] Section 1611(b)(1) of the FSIA states that:

> (b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—
>    (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver…

28 U.S.C.A. § 1611 (West).

§ 1610, CB argues that TRIA's waiver of immunity is preempted by FSIA § 1611(b)(1). (See CB Opp. at 9.) However, the TRIA waiver controls because of the broad language of TRIA's "notwithstanding" clause, the more recent enactment of the TRIA, and the remedial purpose of the TRIA.

First, the TRIA uses broad language to preempt "any other provision of law," while §1611(b) applies narrowly to "the provisions of section 1610." In this District, Weininger v. Castro held that the TRIA's broad language targets *all* statutory exceptions to immunity. See 462 F. Supp. 2d at 498 ("To the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict.") (quoting Smith ex rel Smith, 280 F. Supp. 2d. at 319); see also Peterson, 2013 WL 1155576 at *8 ("TRIA's broad language—'notwithstanding any other provision of law ... in every case'— provides one basis pursuant to which a separate 'central bank' analysis becomes unnecessary.").

Further, to the extent TRIA § 201(a) conflicts with FSIA § 1611(b)(1), any conflict should be resolved in favor of the TRIA because it was enacted after § 1611(b). See Weininger, 462 F.Supp.2d at 499. Congress is presumed to be aware of its previous enactments when it passes a new statute. See Vimar Seguors y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 554 (1995) (citing Cannon v. Univ. of Chicago, 441 U.S. 677, 696–699 (1999)). The TRIA's "notwithstanding" clause—enacted in 2002, well after FSIA § 1611(b) was adopted in 1976— thus preempts central bank immunity to the extent it would apply. See Peterson, 2013 WL 1155576 at *25; Weininger, 462 F.Supp.2d at 499; see also In re Ionosphere Clubs, Inc., 922 F.2d 984, 991 (2d Cir. 1990) ("[W]hen two statutes are in irreconcilable conflict, [courts] must give effect to the most recently enacted statute since it is the most recent indication of congressional intent.")

Finally, providing an exception to attachment and execution for foreign central banks would frustrate the remedial purpose of the TRIA. As discussed above, the purpose of the TRIA is to "deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism." Levin I, 2011 WL 812032 at *17 (internal citations omitted); see also Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 556 U.S. 366, 369 (2009) (noting that the TRIA authorizes "holders of terrorism related judgments against [a terrorist state]…to attach [that state's] assets that the United States has blocked"). CB's arguement that foreign central banks have an "absolute immunity," (CB Opp. at 9), would leave judgment creditors with valid judgments against state sponsors of terror without recourse if assets happened to be held in the account of a foreign central bank, a result plainly inconsistent with the remedial purpose of the statute.

The language of TRIA, the purpose of its enactment, and its subsequent enactment to § 1611(b)(1), all indicate that the TRIA waiver of immunity must control when the two provisions are in conflict. Therefore, central bank immunity does not preempt TRIA and CB funds cannot be considered absolutely immune under FSIA § 1611(b)(1).

## V.       Whether the Judgment Creditors Are Entitled to Interest

The Code of Federal Regulations ("C.F.R.") mandates that financial institutions holding "blocked assets" must place those assets in "an interest-bearing account," specifically "a blocked account in a U.S. financial institution earning interest at rates that are commercially reasonable for the amount of funds in the account."  31 C.F.R. § 595.203(a)(1); § 595.203(b).

The Judgment Creditors contend that this provision obligated the Banks to hold the Phase Two Blocked Assets in accounts that earned, "at a minimum, [interest] equal to rates being paid by [the Banks] to other depositors on deposits or instruments of comparable size and maturity

from the date of blocking until" a disposition on those assets is reached. (<u>See</u> J. Creditors' Stipulation To Issues Presented by Mot. Summ. J. 7.) The Judgment Creditors argue that they are entitled to the payment of such interest, regardless of whether it was actually earned on the Phase Two Blocked Assets. (<u>Id.</u>)

SoGen, with Citibank joining,[19] argues that the "judgment creditors succeed only to rights of their judgment debtor, and Iran, the judgment debtor here, has no claim for interest on blocked accounts. Because Iran could not demand anything beyond the money that is actually in the blocked accounts, neither can the judgment creditors."[20] (SoGen Opp. at 1-3 (citing <u>Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara</u>, 313 F.3d 70, 83 (2d Cir. 2002) (holding that "a party seeking to enforce a judgment 'stand[s] in the shoes of the judgment debtor'" and "cannot 'reach . . . assets in which the judgment debtor has no interest'"); <u>M.F. Hickey Co. v. Port of New York Auth.</u>, 258 N.Y.S.2d 129, 130 (1st Dep't 1965); CPLR § 5225(b); § 5227.) SoGen argues that this same principle applies to garnishees, stating that "if a judgment debtor could not bring a particular claim against a garnishee, then neither can its creditors." (<u>Id.</u> at 3 (citing <u>United States v. First Nat'l City Bank</u>, 321 F.2d 14, 19 (2d Cir. 1963); <u>Smith v. Amherst Acres, Inc.</u>, 350 N.Y.S.2d 236 (4th Dep't 1973).)

SoGen bases its argument on two flawed contentions: first, that Iran has no claim to the interest that SoGen admits has been accruing on the blocked accounts; and second, that the

---

[19] <u>See</u> note 4 <u>supra</u>.

[20] Nevertheless, SoGen asserts that it "complies with OFAC regulations requiring payment of interest [on blocked assets] at a 'commercially reasonable' rate" by paying interest on blocked accounts "on the same basis as . . . similar commercial accounts." (<u>Id.</u> at 2.) SoGen still contests the Judgment Creditors' right to that interest, however. (<u>Id.</u>) In addition, SoGen asserts that enforcing the Judgment Creditors' demand for interest equal to what SoGen pays "other depositors" would require "further fact and expert discovery and evidentiary hearings" that would be "an extraordinary waste of judicial and party resources over, at most, a few thousand dollars." (<u>Id.</u>) This argument is one for the opposing parties to resolve between themselves.

Judgment Creditors' interest demand is founded on an OFAC regulation, 31 C.F.R. § 595.203, which does not create a private right of action for victims of terrorism to sue to obtain the interest that OFAC mandates the garnishee banks accrue.  As the Judgment Creditors correctly point out, SoGen's interpretation of the law renders the OFAC regulation meaningless: the garnishee banks would be compelled to maintain blocked assets in interest-bearing accounts, but that interest would accrue for no one's benefit; neither the judgment debtor nor the judgment creditor would have a right to sue for it.  (See J. Creditors' Reply 22, ECF No. 825.) There is nothing in the underlying statutes or the regulations that indicates that the interest accumulation was intended to benefit the banks instead of judgment creditor victims of terrorism.

## VI.    CONCLUSION

For the reasons stated above, the Judgment Creditors' motion for partial summary judgment with respect to the Phase Two Blocked Assets is granted.  The Banks are hereby ordered to turn over the Phase Two Blocked Assets with accrued interest to the Judgment Creditors in accordance with the protocol designated by the Judgment Creditors.


SO ORDERED.

Dated:  New York, New York
          September 19, 2013

_s/s_____
Robert P. Patterson, Jr.
U.S.D.J.


**Copies of this Order were sent by email to the following attorneys.  All other counsel of record notified by ECF:**

*Counsel for Plaintiffs:*

**Don Howarth**
Howarth and Smith (LA)
523 West Sixth Street, Suite 728
Los Angeles, CA 90014

213-955-9400
Fax: 213-622-9400
Email: dhowarth@howarth-smith.com

**Suzelle M Smith**
Howarth and Smith (LA)
523 West Sixth Street, Suite 728
Los Angeles, CA 90014
212-955-9400
Fax: 213-622-0791
Email: ssmith@howarth-smith.com

*Counsel for Defendants:*

**Howard B. Levi**
Levi Lubarsky & Feigenbaum LLP
1185 Avenue of the Americas
17th Floor
New York, NY 10036
212-308-6100
Fax: 212-308-8830
Email: hlevi@llf-law.com

**J. Kelley Nevling , Jr**
Levi Lubarsky & Feigenbaum LLP
1185 Avenue of the Americas
17th Floor
New York, NY 10036
212-308-6100
Fax: 212-308-8830
Email: knevling@llf-law.com

**Mark Hanchet**
Mayer Brown LLP (NY)
1675 Broadway
New York, NY 10019
(212)506-2500 x2695
Fax: (212)262-1950
Email: mhanchet@mayerbrown.com

**Christopher James Houpt**
Mayer Brown LLP
1675 Broadway
New York, NY 10019
(212) 506-2380
Fax: (212) 849-5830
Email: choupt@mayerbrown.com

**Christopher J. Robinson**
Davis Wright Tremaine LLP (NYC)
1633 Broadway
New York, NY 10019
(212) 489-8230
Fax: (212) 489-8340
Email: chrisrobinson@dwt.com

**Sharon L. Schneier**
Davis Wright Tremaine LLP (NYC)
1633 Broadway
New York, NY 10019
(212) 489-8230
Fax: (212) 489-8340
Email: sharonschneier@dwt.com

*Counsel for Third-Party Defendants:*

**Benjamin Weathers-Lowin**
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
(212)-806-5614
Fax: (212)-806-2614
Email: bweatherslowin@stroock.com

**Curtis Campbell Mechling**
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
212-806-5609
Fax: 212-806-2609
Email: cmechling@stroock.com

**David H. Fromm**
Brown Gavalas & Fromm LLP
355 Lexington Avenue
New York, NY 10017
212 983-8500
Fax: 212 983-5946
Email: dfromm@browngavalas.com